UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY LESNIK, | **VIA ECF** |
| *Plaintiff,* | Case No. 18-CV-3656 (LJL) |
| v. | |
| LINCOLN FINANCIAL ADVISORS CORPORATION, | |
| *Defendant.* | |

## <u>PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1, AS WELL AS PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1</u>

Plaintiff, Jeffrey Lesnik, by and through his attorneys Derek Smith Law Group, PLLC, pursuant to Rule 56 of the Federal Rules of Civil Procedure and 56.1 of the Local Civil Rules of the United States District Court for the Eastern and Southern Districts of New York, respectfully submit the following response to the Defendant's statement of material facts as to which there is no genuine issue to be tried, as well as Plaintiff's counterstatement of material facts as to which there is no genuine issue to be tried.

### A. **About the Parties**

1.      Lincoln Financial Advisors is a broker-dealer and registered investment advisor offering personalized financial planning services to clients. Bonisteel Decl. §2.

**RESPONSE:** Admit.

2.      Defendant is a member of FINRA which writes and enforces rules governing the ethical activities of all registered broker-dealer firms and registered brokers in the United States. Bonisteel Decl. §3.

**RESPONSE:** Admit.

3.      On December 3, 2014, Plaintiff signed a contract to become a registered financial advisor and which confirmed that he was engaged as an independent contractor. See Exhibit A at 95-96.

**RESPONSE:** Admit in part and deny in part. Admit only that Plaintiff signed an "Agent Contract" with Defendant around December 3, 2014, and note that 'Exhibit A' in Defendant's motion papers does not contain a copy of that contract or evidence regarding the contract, it

contains a copy of the Complaint.[1] Plaintiff denies that the contract "confirms" the classification the legal status of "independent contractor" upon Plaintiff.

4.      Plaintiff initially worked from Defendant's New York City Office of Supervisory Jurisdiction ("OSJ") managed by OSJ Supervisor Mitch Scherr.

**RESPONSE:** Admit that Plaintiff worked for Defendant under the supervision of Mr. Scher and note that Plaintiff worked under the supervision of Mr. Scher's New York City OSJ for the duration of Plaintiff's employment with Defendant.

**Plaintiff Was Placed on Heightened Supervision**.

5.      Shortly after he began working, Defendant discovered multiple sales practices violations by Plaintiff.  See Bonisteel Decl. §5; See Exhibit C.

**RESPONSE:** Lack knowledge to confirm or deny.

6.      Specifically, in January 2015, Defendant's Business Practices Manager notified the Regional Compliance Advisor that Plaintiff submitted new business applications for clients in states where he was not licensed.  Defendant's Business Practices department rejected the submitted paperwork and requested that Plaintiff provide newly signed client paperwork once he had the proper licensing.  On 26 occasions, Plaintiff resubmitted the original paperwork with the dates whited out and new dates inserted in place of the previous dates. See Exhibit C at D001400 and D001406-D001408.

---

[1] Defendant's Local Rule 56.1 Statement of Fact repeatedly refers to items in "Exhibit A" that are not contained in that Exhibit.

**RESPONSE:** Lack knowledge to confirm or deny in part and deny in part, and note that in January 2015, Plaintiff had just joined Defendant's firm about a month earlier and the "violations" Plaintiff is accused of are more accurately described as minor administrative errors that occurred while Plaintiff was bringing over his book of clients from Wells Fargo attributable to a lack of communication of Defendant's protocols and procedures for doing so, and a long-time client of Plaintiff upset that Lincoln rejected the transfer of her account from Wells Fargo because she was travelling abroad in Australia, not in a state where Plaintiff is "not licensed." Also deny that merely communicating with clients who are travelling abroad violates any rules, regulation or LFA policy that had been communicated to Plaintiff at the time (See Lesnik Decl. 58, Exhibit 2, Exhibit 7 at pp. 199-200) Further the Exhibit cited to only contains allegations of these "violations" and it also contains correspondence showing that they resulted from miscommunication and other minor stumbling blocks in connection with Plaintiff's onboarding to Defendant's firm and they were resolved and remediated. See Exhibit C at D001407-D001419, D001424-D001428. In his response to compliance, Mr. Scher, Plaintiff's supervisor, explains the discrepancies and takes responsibility for them, stating:

*"When Jeff* [Plaintiff] *joined Lincoln he understood that his start date with LFA was 12/12 and he started to send out change of broker-dealer paperwork, as well as see clients to do the paperwork on that date. However his actual start date was pushed back to 12/19. Because of this a number of his change of broker-dealer packets were rejected because they were dated prior to the 19th*
*In his haste to get paperwork completed Jeff* [Plaintiff] *contacted his clients and Informed them he was going to change the date on the forms. All the forms with the whiteout were from this period of time. Jeff now understands that any alteration on an application must be initialed by the client, and that whiteout can never be used.*
*Because of this occurrence I have changed the process regarding broker-dealer paperwork in my Manhattan office. I now must review every new account application, or transfer form, before it can be processed. Any forms sent In from my other detached offices must be cc'd to our office for me to review." Exhibit C at D001407*

Additionally, Defendant refers to these as policy "infractions" See Exhibit C at D001409 and D001428.

7.      Second, in February 2015, the Branch Operations Manager discovered that Plaintiff had emailed a blank document to a client and requested that the client "sign page 4 and I will take care of the rest ASAP."   See Exhibit C at D001401 and D001409.

**RESPONSE:** Lack knowledge to confirm or deny in part and admit in part, but add that as of February 2015 Defendant never informed Plaintiff of this policy against sending blank forms to clients. This was not the policy at Plaintiff's previous employers.  Having not been informed of Defendant's policy, Plaintiff conducted administrative affairs in accordance with the protocols he was familiar with in his experience at previous firms. See Lesnik Decl. ¶¶4-5, Exhibit B p. 189

8.      Defendant's policies prohibit forwarding blank documents to clients.  See Exhibit A at 189-190.

**RESPONSE:** Lack knowledge to confirm or deny, but also note that Exhibit A is a copy of the Complaint and does not contain any copies of Defendant's policies. See Exhibit A *generally*. Also note that Defendant did not make Plaintiff aware of this policy until they accused him of violating it. See Exhibit B p. 189

9.      Third, also in February 2015, Defendant's Branch Operations Manager discovered that Plaintiff had communicated with a client while the client was outside the United States.   See Exhibit A at. 192- 194, 199-200 and Exhibit C at D001411- D001412.

**RESPONSE:** Lack knowledge to confirm or deny in part and admit in part, but note that the client in question has a longstanding friendly relationship with Plaintiff and as of February 2015 Defendant never informed Plaintiff that it was against company policy to communicate with clients while they are travelling abroad, and further note that Exhibit A is a copy of the Complaint and

does not contain any copies of or evidence about Defendant's policies Further note that merely communicating with a client who is abroad is not a violation. See Exhibit A *generally*, Exhibit C at D001411- D001412 and Exhibit 2, Exhibit 7 at pp. 199-201

10.     Defendant has strict rules relating to communications with clients outside the United States since neither Defendant nor Plaintiff are securities registered or insurance licensed outside the United States.   See Exhibit C at D001401.

**RESPONSE:** Lack knowledge to confirm or deny in part and admit in part only to the extent Plaintiff is not licensed or registered outside of the United States, and also note that as of February 2015 Defendant never informed Plaintiff of the specifics of their policy's "strict rules what types of communications can be had with clients when they are abroad". See Exhibit C at D001401, Exhibit 7 at pp. 199-201

11.     Further, Defendant discovered that the client had complained to Plaintiff about the handling of her account stating in one written communication to Plaintiff "I am quite upset about the situation with my account, and that no one has been overseeing my funds for a couple of months now" and in a second e-mail, the client wrote to Plaintiff "I am so angry I am at a loss for words."   See Exhibit A at 196-197, 203-204 and Exhibit C at D001411-D001412. Defendant's Compliance Manual requires that advisors promptly report all client complaints.

**RESPONSE:** Deny.  The client in question was upset that Defendant rejected the paperwork to transfer her account from Well Fargo, at the time this was not a violation, Defendant has only characterized it as such post-bankruptcy. Additionally Exhibit A, cited by Defendant is a copy of the Complaint and does not contain any copies of or evidence regarding Defendant's policies, further the client in question has a very warm relationship with Plaintiff and is beside herself that

Defendant would be attempting to use her emails against Plaintiff. See Exhibit A *generally*, Exhibit C at D001411-D001412 and Exhibit 2, and Exhibit 7 at pp. 196-196. Further, Defendant's NYC OSJ supervisor Mitchell Scher testified that customer complaints were not a reason for Plaintiff's termination. See Exhibit 10 at p. 85

12.     Fourth, in June 2015, the Assistant Vice President of Investment Services notified the Regional Compliance Advisor of a trading pattern which reflected that Plaintiff charged excessive commissions on over fifty trades executed between May 28, 2015 and June 3, 2015, despite having been advised on several occasions about overriding the commission schedule charged by Defendant. See Exhibit A at 220-221 and Exhibit C at D001416-D001420.

**RESPONSE:** Lack knowledge to confirm or deny in part and deny in part, but also note that the "excessive commissions" Plaintiff is alleged to have charged were not excessive in comparison to the commissions he charged at all of his previous firms and **were at a rate in accordance with what he was told he would be allowed to charge when Defendant recruited him**. Also note that Defendant "never explained the commission schedules" to Plaintiff. Additionally Exhibit A, cited by Defendant is a copy of the Complaint and does not contain any information Defendant claims relates to these facts. See Exhibit A *generally*, Exhibit C at D001416,  D001420, Exhibit B at p. 220 and Lesnik Decl. ¶¶ 20-21, 69, 79

13.     On June 12, 2015, the Business Conduct Committee met to review the multiple concerns identified and determined that Plaintiff should be placed on a one-year Plan of Heightened Supervision, from June 29, 2015 to June 29, 2016. See Exhibit A at 222-223.

**RESPONSE:** Lack knowledge to confirm or deny in part and admit in part only insofar as Plaintiff was subject to a Plan of Heightened Supervision starting in June 2015 until he successfully completed the Plan in June 2016, whereupon he was no longer subject to the Plan. Also note this

occurred over 2 years before Plaintiff was terminated. See Lesnik Decl. ¶¶ 74, 99; Exhibit 3

Additionally Exhibit A, cited by Defendant is a copy of the Complaint and does not contain any

evidence Defendant claims relates to these facts.

14.    FINRA Rule 3110 (Supervision) requires member firms to establish and

maintain a system to supervise the activities of each associated person that is reasonably designed

to achieve compliance with applicable securities laws and FINRA rules.  An effective supervisory

system is designed to prevent sales abuses, and thus, enhances investor protection and market

integrity. FINRA Regulatory Notice 18-15 "Guidance on Implementing Effective Heightened

Supervisory Procedures for Associated Persons With a History of Past Misconduct."

**RESPONSE:** Lack knowledge to confirm or deny, but deny that Plaintiff has a "history of

misconduct" with respect to FINRA rules and regulations or any other law or securities regulation,

unlike both Scott Fox (Plaintiff's fellow FA) and Mitchell Scher (Plaintiff's supervisor) who both

have FINRA violations, disclosures and settlements and/or inquiries by FINRA reflected on their

brokercheck.com profiles. See Exhibit 7 at pp. 140.

15.    Plaintiff signed and agreed to the period of heightened supervision.

**RESPONSE:** Admit

16.    Effective August 16, 2016, after completion of his period of Heightened

Supervision, Plaintiff was permitted to open and work from a non-supervisory branch office in his

home in Brooklyn.    See Exhibit A at. 76-77.

**RESPONSE:** Admit that Plaintiff was allowed to open up a home-satellite branch, but it was at

Defendant's request, also Defendants do not allow Financial advisors who they suspect of

violations or malfeasance to open up home satellite branch offices. Additionally Exhibit A, cited

by Defendant is a copy of the Complaint and does not contain any evidence Defendant claims

relates to these facts. See Exhibit A *generally*; and Lesnik Decl. ¶¶ 83-84; Exhibit 10 at p. 116

**B. Plaintiff's Home Office was Audited in April 2017 and Multiple Areas for Improvement Were Identified.**

17.     FINRA supervisory rules require ongoing and periodic review of securities

related activities in the locations of the broker/dealer.  The stated objective of the inspection is to

"evaluate compliance with broker/dealer policies and procedures as they relate to a variety of

regulatory issues including but not limited to: Books and Records, Account Processing, Market

Conduct, Security of client information."

**RESPONSE:** Lack knowledge to confirm or deny.

18.     As part of this internal review, Plaintiff's home office was audited in April

2017. See Exhibit A at. 288-289.

**RESPONSE:** Admit. Additionally Exhibit A, cited by Defendant is a copy of the Complaint and

does not contain any evidence Defendant claims relates to these facts. See Exhibit A *generally*.

19.     LFN Compliance issued a Satisfactory-Needs Improvement opinion for the

inspection and expressly identified areas for improvement. On June 7, 2017, LFN Compliance sent

Plaintiff a letter advising him of their findings.  See Exhibit D at D019933.

**RESPONSE:** Admit that Plaintiff's audit was satisfactory and identified areas of improvement

and that Defendant sent a letter noting as much, but also note that Exhibit D cited by Defendant

does not contain any pages that are Bates numbered, and the PDF filed on ECF is not text-searchable in violation of You Honor's individual rule 2.C. and should be disregarded as such[2].

      20.      Specifically, LFN Compliance identified the following deficiencies as part of its audit:

> Evidence found of original incoming correspondence to Plaintiff that was not sent to the OSJ for review.

> Evidence found of outgoing correspondence by Plaintiff that was not on Lincoln approved letterhead and therefore did not include the appropriate regulatory and broker/dealer disclosures.

> Plaintiff was unaware of Defendant's policy to date stamp all incoming correspondence upon receipt.

> Evidence found that Plaintiff was not forwarding outgoing correspondence to the OSJ for review.

> Evidence found that multiple clients held the same low priced securities and that Plaintiff was actively trading in low priced stock --- specifically Plaintiff solicited 1328 low price stock trades in ten different stocks for 30 different clients.

See Exhibit D at D019935-D019936.

**RESPONSE:** Admit that Exhibit D identifies the points above as "[o]bservations and opportunities for improvement" and also note that this audit was not "the catalyst" for Plaintiff's presentation before the Business Conduct Committee, which terminated his employment. See Bonisteel Decl  ¶ 15. Also further note that the audit of Plaintiff's home office was considered praiseworthy so much so that audit gave Plaintiff's satellite office "high marks" and that Mr. Scher was "very, very pleased" with the results of Plaintiff's audit. (See Exhibit 7 pp. 77, 288)

---

[2] In fact Exhibit B and Exhibit D submitted by Defendant via ECF are non-text-searchable in violation of Your Honor's Individual Rule 2.C., and thus should be disregarded for the purposes of this motion.

21.     Plaintiff was directed to submit his responses to the audit findings within thirty days of the June 7th letter. See Exhibit D at D019933.

**RESPONSE:** Admit Plaintiff was so directed, but also note that Exhibit D cited by Defendant does not contain any pages that are Bates numbered, and the PDF filed on ECF is not text-searchable in violation of You Honor's individual rule 2.C. and should be disregarded as such

22.     Plaintiff submitted responses indicating his understanding of the policies relating to the above listed deficiencies concerning incoming and outgoing correspondence.  See Exhibit E at D019945 – D019050.

**RESPONSE:** Admit that Plaintiff communicated that he understood the policies and his audit was closed and further note that in a June 2017 email exchange between Defendant's compliance officer and Plaintiff upon the successful remediation of the "opportunities for improvement" noted in the audit that the audit was closed and "officially" wrapped up. See Exhibit E at D019949

23.     With regard to the identified deficiency relating to trading low priced securities, it was agreed that OSJ Supervisor Mitch Scher would review Plaintiff's future low priced trade tickets. See Exhibit E at D019944

**RESPONSE:** Admit that Defendant's solution to remediate this concern was that Mr. Scher, as supervisor, would review Plaintiff's future low priced trade tickets, and note that upon remediation of the identified areas of improvement in the audit, Plaintiff's audit was "officially" closed. See Exhibit E at D019945-D019949.  Additionally, Exhibit E *does not contain any pages Bates numbered D019944,* which Defendant cites.

**C.  <u>Plaintiff Filed for Bankruptcy.</u>**

24.     On June 1, 2017, Plaintiff was served with an arbitration award against him in connection with a FINRA arbitration with his prior employer Wells Fargo Advisors. See Exhibit F at D001436-D001439.

**RESPONSE:** Admit.

25.     By letter dated July 6, 2017, FINRA advised Plaintiff that, as a result of his failure to comply with the award, his association with FINRA would be suspended  effective July 27, 2017, unless he paid the award in full, entered into a settlement agreement with Wells Fargo, filed a timely action to modify or vacate the award or filed a petition for bankruptcy.  See Exhibit G at D001433-D001434.

**RESPONSE:** Admit

26.     On July 14, 2017, Plaintiff forwarded the FINRA award to Defendant and stated that he was advised by his attorney to seek bankruptcy protection.  See Exhibit H at D001432.

**RESPONSE:** Admit.

27.     By email dated July 25, 2017, Plaintiff advised Defendant that he had filed for bankruptcy. See Exhibit I at D001440-D001442.

**RESPONSE:** Admit.

### D. In August and November 2017, The BCC Met to Review Plaintiff's Case and Decided to Terminate Plaintiff's Registration with LFA.

28.     On August 2, 2017, consistent with its practices, the Business Conduct Committee met to review Plaintiff's situation.    See Exhibit J at D001444.

**RESPONSE:** Lack knowledge to confirm or deny, but note that the Exhibit cited by Defendant states that the reason Plaintiff was on the Business Conduct Committee's agenda

was because: Plaintiff "[f]iled for bankruptcy to avoid suspension by FINRA due to [Plaintiff's] RR's failure to pay an arbitration award granted to his previous firm." See Exhibit J at D001444

29.    A decision regarding Plaintiff's case was deferred pending additional review of a number of Plaintiff's transactions on behalf of clients. See Exhibit J at D001444.

**RESPONSE:** Lack knowledge to confirm or deny.

30.    On September 12, 2017, LFN Surveillance, by email to Plaintiff, requested explanations for activity on five of his accounts which reflected high trade volume.   See Exhibit K at D001449, D001454, D001460, D001466 and D001472

**RESPONSE:** Admit but also note that Plaintiff provided detailed and substantiated responses to each and every one of those inquiries detailing why those trades were justified and documenting that the trades in question generated very favorable returns for their respective accounts and that for many of the trades inquired about Plaintiff charged no commission. See Exhibit K at D001450-D001453, D001455-D001459, D001461-D001465, D001467-D001471 and D001473-D001480

31.    The BCC noted that Plaintiff's "active trading has been an ongoing focus of the Surveillance and AML teams in 2017 based on the volume of trades, commissions charged, and profile of the specific accounts/clients."   See Exhibit K at D001447.

**RESPONSE:** Admit but also note that in the same document, the BCC notes that the "Reason For Review" was because "[Plaintiff] filed for bankruptcy". The document also states: "[Plaintiff] provided [Defendant] with evidentiary Chapter 7 Bankruptcy filing notification; Form U4 disclosure was submitted" and "over $75K in unsecured debt… is likely to be discharged." Continuing:

*Unless there are assets that he hasn't disclosed, the Trustee will find this to be a "no asset" case and **his creditors with will get nothing**"… "The Trustee has also moved to extend the time to file an objection to discharge, but the pleadings do not state the reason for the delay. It could just be the schedules or it could be that the Trustee thinks he might have more assets/income than he is claiming, I suspect the former but until something is filed on the record we won't know. If the Trustee finds assets, the Trustee will give creditors the opportunity to make a claim. Based on the pleadings so far **it doesn't appear that there will be a distribution to creditors**."* (emphasis added)

See Exhibit K at D001446-D001447

      32.    Plaintiff submitted responses to each of the five requests. See Exhibit K at D001449-D0011480.

**RESPONSE:** Admit.

      33.    On November 16, 2017, the Business Conduct Committee met to review Plaintiff's case, after completion of the review by Surveillance, and decided to terminate Plaintiff's registration with LFA. See Exhibit K at D001445.

      **RESPONSE:** Lack knowledge to confirm or deny in part and admit in part but also note that this document states: "**[Plaintiff f]iled for bankruptcy** to avoid suspension by FINRA due to [Plaintiff's] RR's failure to pay an arbitration award granted to his previous firm. BCC DECISION 11/13/17: **TERMINATION**" (emphasis added). See Exhibit K at D001445

      34.    Plaintiff was advised of Defendant's decision by letter dated November 16, 2017. See Exhibit L at D00404.

**RESPONSE:** Admit but also note that the sole reason given for Plaintiff's termination in this letter is Plaintiff's "Chapter 7 Bankruptcy." See Exhibit L at D00404.

35.     Following the termination of Plaintiff's registration, Defendant filed a U5 form with FINRA stating that Plaintiff was terminated "by the firm's business conduct committee because of concerns with [your] financial fitness and sales practices."  See Exhibit M at D001482.

**RESPONSE:** Admit the Defendant filed a U5 that failed to include the reason given to Plaintiff as to why he was terminated, Chapter 7 bankruptcy, and also note that on the same U5 where Defendant is asked if Plaintiff was discharged due to any alleged violation of any "industry standards of conduct", Defendant stated "no." See Exhibit M at D001483 Question 7F.1

36.     By letter dated December 26, 2017, FINRA advised Plaintiff that it was conducting an investigation of whether there were any violation of federal securities laws and directed Plaintiff to submit his response by January 9, 2018.  See Exhbit A at. 291-292 and Exhibit N.

**RESPONSE:** Admit and note that months later, in a 'no action' letter dated February 14, 2018 FINRA informed Plaintiff that as a result of FINRA's inquiry into the allegations Defendant made against Plaintiff on the U5 form, the agency was closing the inquiry. See Lesnik Decl. ¶111 Also Exhibit A contains a copy of the Complaint and is incorrectly cited.

37.     On January 19, 2018, Plaintiff submitted his response to FINRA, ending his letter by stating that it is his assertion that Lincoln Financial "violated Section 525 of the Bankruptcy Code by terminating me."  See Exhibit A at 293-294, 301.

**RESPONSE:** Admit.

38.     Plaintiff testified at his deposition that at the time he wrote the January19th letter to FINRA he was thinking about filing a lawsuit.  See Exhibit A at 302-303.

**RESPONSE:** Admit.


E.   **Plaintiff Filed an Amended Schedule with the Bankruptcy Court.**

39.     Following his termination, on January 24, 2018, Plaintiff filed an Amended Schedule with the Bankruptcy Court.  See Exhibit P (ECF No. 39).

**RESPONSE:** Admit, and note that the Amended Schedule relates to property in Plaintiff's possession as of the July 24, 2017 commencement of Plaintiff's Chapter 7 filing and sole reason Plaintiff amended his Schedule A/B was to correct the valuation of property in his possession as of July 24, 2017, primarily a 1969 Ford Mustang initially erroneously initially valued by Plaintiff's bankruptcy attorney at $26,000. The Amended Schedule states the correct valuation for the Mustang at $4,300 and correctly notes that only "Debtor 1" [Plaintiff] owned the interest in the Mustang (rather than both debtors, Plaintiff and his wife). See Exhibit P #3.1 and Exhibit 6, the original Schedule A/B filed on August 11, 2017 at #3.1; Lesnik Decl. ¶116


40.     The Schedule (question no. 33) asks Plaintiff to identify "Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment."  The Schedule identified the following examples: "Accidents, employment disputes, insurance claims, or rights to sue."  Plaintiff checked the "no" box for this inquiry.  See Exhibit P.

**RESPONSE:** Admit and also note that on advice from Plaintiff's bankruptcy counsel that a bankruptcy Schedule A/B in Chapter 7 cases relate only to property in possession of the debtor at

the commencement of the bankruptcy, including potential legal claims, Plaintiff did not alter the answer to question no. 33 in his Amended Schedule A/B. See Lesnik Decl. ¶114

41.     Plaintiff's bankruptcy case was closed on March 13, 2018 and an order was entered discharging the debtor.  See Exhibit Q (ECF No. 42).

**RESPONSE:** Admit.

42.     Ten days after his debts were discharged, on March 23, 2018, Plaintiff executed a retainer agreement with his prior attorney in this case – Gregory Antollino and one month later, on April 25, 2018 commenced this action. See Exhibit R

**RESPONSE:** Admit.

## PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

43.     Plaintiff has been a financial advisor, primarily brokering the trades of stocks and other securities since around May 1989 (Lesnik Decl. ¶ 4).

44.     Plaintiff was licensed by FINRA for his entire career.  (Lesnik Decl. ¶ 5).

45.     Plaintiff has been continuously employed as a financial advisor by various firms engaged in the trade of financial advising over the span of his nearly three-decade career, during which time he forged professional relationships with numerous clients of the firms where he was employed, and those clients typically followed Plaintiff as he joined new firms. Plaintiff's client retention rate throughout his career was 85-90%. (Lesnik Decl. ¶ 6)

46.      These clients who followed Plaintiff from firm-to-firm over the course of his career are described in financial industry vernacular as a 'book of clients' or 'book of business.' (Lesnik Decl. ¶ 7).

47.     When Plaintiff joined Defendant's firm, Plaintiff brought his book of clients with him. All of those clients began receiving statements directly from Defendant. (Lesnik Decl. ¶ 9)

48.     As a financial advisor, for the entirety of his career, Plaintiff primarily engaged in the sale of financial instruments, which includes brokering the sales and trades of investment securities. (Lesnik Decl. ¶ 10).

49.     The previous firms that employed Plaintiff prior to his employment with Defendant include Merrill-Lynch, Smith Barney, Lehman Bros., Wells Fargo and First Albany. (Lesnik Decl. ¶ 11)

50.     All of these firms' primary business involves the sale of financial instruments, which includes brokering the sales and trades of investment securities (Lesnik Decl. ¶ 11).

51.     Plaintiff worked for Wells Fargo Advisors, LLC, (hereinafter referred to as "Wells Fargo") a financial advisor firm, from around early January, 2008 to around December, 2014. (Lesnik Decl. ¶ 12).

52.     Wells Fargo Advisors, LLC primarily engages in the sale of financial instruments, which includes brokering the sales and trades of investment securities. (Lesnik Decl. ¶ 13).

53.     While Plaintiff worked at Wells Fargo Advisors, LLC, Plaintiff was classified as an employee and issued an annual IRS form W2. (Lesnik Decl. ¶14).

54.     Since beginning his career in 1989 until he went to work for Defendant in 2014, Plaintiff worked for approximately seven different financial advisor firms. (Lesnik Decl. ¶ 15).

55.     All seven of Plaintiff's previous firms primarily engage in the sale of financial instruments, which includes brokering the sales and trades of investment securities. (Lesnik Decl. ¶ 16).

56.     While Plaintiff worked at all seven of his previous firms Plaintiff was classified as an employee and issued an annual IRS form W2. (Lesnik Decl. ¶ 17)

57.     While Plaintiff worked for Defendant, Plaintiff engaged in exactly the same type of work he performed for his previous employers. (Lesnik Decl. ¶ 18)

58.     From approximately December 12, 2014 to approximately November 16, 2017 Plaintiff worked exclusively for Defendant as financial advisor. (Lesnik Decl. ¶ 19).

59.     When Plaintiff was being recruited to work for Defendant, Defendant, through their New York City branch manager, Mitchell Scher, Defendant assured Plaintiff that he would be able to charge a comparable commission rate Plaintiff charged at all of his previous employers which represented standard rates in the industry. (Lesnik Decl. ¶ 20).

60.     The only way Mr. Scher could entice Plaintiff to join Defendant's firm was by telling Plaintiff that Plaintiff would be allowed to charge commission rates comparable to the rates Plaintiff was allowed to charge in Plaintiff's previous firms.  (Lesnik Decl. ¶ 21).

61.     In joining Defendant's firm Plaintiff was guaranteed a minimum 65% per dollar of commission generated and that Defendant's commission schedule would be comparable to my previous firm. (Lesnik Decl. ¶ 21)

62.     Plaintiff relied upon Mr. Scher's assurances regarding commission rates when Plaintiff decided to join Defendant's firm.  (Lesnik Decl. ¶ 22)

63.     Mr. Scher acknowledged that Plaintiff was misled during his recruitment and soon after he joined the firm with regard to the commission schedule. (Lesnik Decl. ¶ 69, 79; Exhibit 10 at pp. 72-73)

64.     There was no cognizable difference between the day-to-day tasks Plaintiff performed in his work routine at Plaintiff's previous employers and the day-to-day tasks Plaintiff performed in his work routine for Defendant.  (Lesnik Decl. ¶ 23) .

65.     FINRA operates a website, brokercheck.com, which allows the public to access employment histories and financial industry disclosures and records for firms and individuals who are licensed by FINRA to conduct business in the financial industry. (Lesnik Decl. ¶ 24)

66.     During the time Plaintiff worked for Defendant as a financial advisor, Plaintiff's brokercheck.com profile listed Plaintiff's "Current Employments" as the Defendant, "LINCOLN FINANCIAL ADVISORS CORPORATION." (Lesnik Decl. ¶ 25)

67.     No other firms were listed on the website as Plaintiff's employer during the time period the website listed Defendant as Plaintiff's employer and during that time, Defendant was exclusively employed by Defendant.  (Lesnik Decl. ¶ 26)

68.     Every statement issued to Plaintiff's clients was on Defendant's letterhead and listed Plaintiff as their "Account Executive." (See *generally* Exhibit K at D001456, D001457, D001462, D001463, D001468, D001474, D001475)

69. Financial advisor services are Defendant's primary business and Defendant's name is LINCOLN FINANCIAL ADVISORS CORPORATION. (Bonisteel Decl. ¶ 2)

70. Defendant strictly prohibited Plaintiff from providing financial advisor services to any other firms or to any individuals who were not Defendant's clients. Plaintiff understood that and financial advisor who did so would be terminated. (Lesnik Decl. ¶ 27)

71. Plaintiff was on Defendant's payroll. (Lesnik Decl. ¶ 28)

72. Plaintiff's income consisted solely of income generated via the work performed for Defendant and Defendant's clients, thus Plaintiff was entirely economically dependent upon his employment with Defendant. (Lesnik Decl. ¶ 29)

73. Plaintiff's employers prior to Defendant offered Plaintiff numerous fringe benefits. (Lesnik Decl. ¶ 30).

74. While Plaintiff worked for Defendant, Defendant offered Plaintiff numerous fringe benefits, including life insurance, health insurance including vision and dental coverage, and other forms of personal insurance coverage. (Lesnik Decl. ¶ 31 and Exhibit 8)

75. Defendant offered Plaintiff other savings and personal insurance benefits. (Lesnik Decl. ¶ 32, Exhibit 8).

76. While Plaintiff worked for Defendant, Defendant mandated that Plaintiff carry errors and omissions insurance from a specific insurance carrier designated by Defendant. Plaintiff was not allowed to choose which errors and omissions insurance carrier he used. (Lesnik Decl. ¶ 33, Exhibit 10 at p.102)

77.     Defendant required that the errors and omissions insurance had to be purchased from the insurance carrier mandated by Defendant. (Lesnik Decl. ¶ 34)

78.     Defendant required that Plaintiff carry the specific policy of their choosing. (Lesnik Decl. ¶ 34, Exhibit 10 at p.102)

79.     While Plaintiff worked for Defendant, Defendant supplied the laptop computer that Plaintiff used for work.  Defendant did not allow Plaintiff to use any other computer for work. (Lesnik Decl. ¶ 35)

80.     While Plaintiff worked for Defendant, Defendant supplied the software on the computer that Plaintiff used for work.  (Lesnik Decl. ¶ 36)

81.     Defendant did not allow Plaintiff to use any other software for work. (Lesnik Decl. ¶ 36).

82.     Plaintiff exercised strict control and monitoring of all of the instrumentalities related to Plaintiff's work as a financial advisor while Plaintiff worked for Defendant. (Lesnik Decl. ¶ 37).

83.     Defendant hosted and maintained access to the email address that Plaintiff used to communicate with clients.  Defendant prohibited Plaintiff from communicating with clients via any other email accounts. Defendant maintained access to and reviewed emails between Plaintiff and Defendant's clients. (Lesnik Decl. ¶ 38).

84.     Defendant surveilled and monitored email communications between Plaintiff and his clients as they do with all of their Financial Advisors. (Lesnik Decl. ¶ 38)

85.     Defendant's work email was controlled and hosted by Defendant. The suffix to Plaintiff's work email address was "@LFG.com", which stands for "Lincoln Financial Group," one of Defendant company's names. (Lesnik Decl. ¶ 39)

86.     Defendant required that Plaintiff report any and all gifts exchanged between Plaintiff and Defendant's clients. (Lesnik Decl. ¶ 40)

87.     While Plaintiff worked for Defendant, Defendant supplied the email account that Plaintiff used for work.  Defendant did not allow Plaintiff to use any other email account for work. (Lesnik Decl. ¶ 38)

88.     For the majority of time Plaintiff worked for Defendant, Defendant required that Plaintiff worked stationed in an office at Defendant's office located at 1359 Broadway, New York, New York.  (Lesnik Decl. ¶ 41)

89.     Defendant did not charge Plaintiff rent. (Lesnik Decl. ¶ 41)

90.     Defendant required that Plaintiff adhere to strict company policies mandating that all of Plaintiff's work files be kept in a specific locked filing cabinet. (Lesnik Decl. ¶ 42, Exhibit 4 at p. 41).

91.     While Plaintiff worked in his office, at Defendant's office space, Defendant provided a telephone for Plaintiff to use for work.  (Lesnik Decl. ¶ 43)

92.     Defendant did not allow Plaintiff to use his personal cell phone to speak with clients. (Lesnik Decl. ¶ 43)

93.     All of Plaintiff's work for Defendant was closely monitored by Defendant and Defendant required Plaintiff to submit highly detailed weekly reports describing each transaction Plaintiff completed for Defendant's clients. (Lesnik Decl. ¶ 44)

94.     Defendant required that Plaintiff attend continuing education courses conducted by a specific continuing education provider of Defendant's choosing in order to meet FINRA requirements.  Defendant did not allow Plaintiff to select the continuing education provider of his own choosing that would have allowed Plaintiff to fulfill FINRA's continuing education requirements. (Lesnik Decl. ¶ 45)

95.     Defendant maintained strict oversight over Plaintiff's FINRA continuing education requirements and upcoming deadlines.  Defendant would notify Plaintiff if a FINRA continuing education deadline was approaching and direct Plaintiff to attend a continuing education course with Defendant's mandated continuing education provider. (Lesnik Decl. ¶ 46).

96.     Defendant supplied Plaintiff with business cards emblazoned with Defendant's name and logo. (Lesnik Decl. ¶ 47)

97.     When Plaintiff began working for Defendant, the parties executed an "Agent Contract" agreement and a "Promissory Note" with a term of five (5) years. This note was substantially similar to the promissory notes executed when he joined his previous firms. (Lesnik Decl. ¶ 48, Exhibit 9).

98.     Plaintiff worked exclusively for Defendant from December 2014 to November 2017. (Lesnik Decl. ¶ 49)

99.     Plaintiff was paid directly by Defendant. (Lesnik Decl. ¶ 50)

100.     Plaintiff's supervisor, Mr. Scher instructed Plaintiff that Plaintiff would be working for Defendant for the five (5) year term referenced in the Promissory Note. This note was substantially the same as similar promissory notes executed when Plaintiff joined his previous firms. (Lesnik Decl. ¶ 51)

101.    Defendant required that Plaintiff provide his professional services solely and exclusively to Defendant and Defendant's clients. (Lesnik Decl. ¶ 52)

102.    When Plaintiff was recruited and even after he was hired, Defendant did not disclose that Plaintiff would be required to adhere to a commission rate dictated by the company's commission schedule that was approximately 50% lower than the rate he was allowed to charge while employed by his previous firms. (Lesnik Decl. ¶ 53; Exhibit 7)

103.    Within the first six months of Plaintiff's employment with Defendant, he was informed by Mr. Scher that Mr. Scher had misrepresented Defendant's commission schedule during the recruitment process and even after Plaintiff joined defendant's firm. Defendant required that Plaintiff strictly adhere to a non-negotiable commission rate mandated solely by Defendant, which charged clients far below the percentage rate capped by FINRA regulations and was substantially lower than rates charged by all of the other firms where I worked previously who charge the prevailing market rate. (Lesnik Decl. ¶ 54)

104.    The commission rates allowed by Plaintiff's previous employers reflect industry standard rates for commissions on trades and investments of stocks and other similar securities. (Lesnik Decl. ¶ 55)

105.    The rates dictated by Defendant's non-negotiable commission schedule are well below the standard market rate, which Plaintiff was familiar with and charged in his previous employment as a financial advisor for other firms. (Lesnik Decl. ¶ 56)

106.    Defendant required that Plaintiff immediately report any and all customer complaints about Plaintiff to Defendant. (Lesnik Decl. ¶ 57)

107.    Around February 2015 Plaintiff received an email from a client who was frustrated because Defendant rejected the transfer of her account from Wells Fargo to Defendant. That complaint was related to Defendant's rejection of her account, which was not under Plaintiff's control. (Lesnik Decl. ¶ 58)

108.    The client in question later emailed Plaintiff after Defendant terminated him to express sympathy and regret that Defendant would try to use and twist her emails to disparage Plaintiff and to hold the emails against him. (See Exhibit 2)

109.    Defendant exercised strict controls and surveillance over the manner and means by which Plaintiff worked. (Lesnik Decl. ¶ 59)

110.    Defendant periodically asked Plaintiff to explain and justify particular actions Plaintiff took in connection with Plaintiff's work.  (Lesnik Decl. ¶ 60)

111.    Plaintiff always provided clear and detailed written explanations of any particular trades Defendant inquired about which resolved each inquiry. (Lesnik Decl. ¶ 61)

112.    Plaintiff was never disciplined or issued any type of written warning or correction letter, or letter of caution, or subject to any fines by Defendant regarding the types of transactions he conducted. (Lesnik Decl. ¶ 62)

113.    Violations of company policy happen "all the time" and often the offending Financial Advisor will be subject to disciplinary action such as a "Letter of Caution" or a fine. (See Exhibit 4 at P. 26) Additionally witness Joseph Breakstone,

114.    Plaintiff's previous employers periodically asked Plaintiff to explain and justify particular actions Plaintiff took in connection with Plaintiff's work for those firms. (Lesnik Decl. ¶ 63)

115.    When Plaintiff joined Defendant's firm in 2014, Plaintiff owed approximately $230,000 on a loan from his former employer, Wells Fargo (hereinafter referred to as the "Wells Fargo Loan").  This loan was part of an enticement for Plaintiff to leave his previous firm, Smith Barney to join Wells Fargo. These loans are a common recruiting practice within the industry.  Defendant also gave Plaintiff a similar promissory note when he joined their firm. (Lesnik Decl. ¶ 64 and Exhibit 8)

116.    When Defendant recruited Plaintiff to join their firm, they were fully aware of this outstanding loan balance on the Wells Fargo Loan, however at that time Defendant never informed  me of Defendant's inordinately low and non-negotiable commission schedule. (Lesnik Decl. ¶ 65)

117.    When Defendant was recruiting Plaintiff to join their firm, Defendant, via their supervisor Mr. Scher, affirmatively stated to Plaintiff that he would be able to earn a commission rate substantially the same as or close to the commission rate Plaintiff was able to earn at his previous places of employment. (Lesnik Decl. ¶ 66)

118.    It was not until several months after Plaintiff started working for Defendant and Plaintiff brought his book of clients to Defendant's firm that Plaintiff learned of Defendant's substantially lower commission schedule and that the commission schedule was non-negotiable and strictly enforced. (Lesnik Decl. ¶ 67)

119.    Defendant's commission schedule was approximately less than one half of commission rates charged by Plaintiff's previous employers. (Lesnik Decl. ¶ 68)

120.    Upon becoming aware of this low commission schedule Plaintiff was required to adhere to he asked his supervisor, Mr. Scher, to attempt to negotiate a rate more in-line

with industry standards.  Shortly thereafter, Mr. Scher apologized to Plaintiff and informed him that Defendant was unwilling to negotiate and unwilling to consider allowing Plaintiff to charge a commission rate that was commensurate with the industry standard rate he was previously able to charge at other firms. (Lesnik Decl. ¶ 69)

121.    In an attempt to mitigate the shortfall in Plaintiff's income, because he understood that Plaintiff was misled during the recruitment process regarding Defendant's commission schedule, Mr. Scher authorized several addendums to Plaintiff's Agent Contract to try to make up for the commission schedule shortfall that increased the total percentage Plaintiff would retain from each dollar of commissions generated, but this had little impact to increase Plaintiff's income because Defendant's non-negotiable cap on commissions was so low. (Lesnik Decl. ¶ 69; Exhibit 10 p. 67-68, 72, 73,148-149)

122.    Because Defendant's commission schedule was substantially lower than the rate schedules of Plaintiff's previous employers, substantially lower than prevailing market standard rates and far lower than the FINRA cap on commission rates, the income Plaintiff could expect to earn was reduced by approximately 50%. (Lesnik Decl. ¶ 70)

123.    Approximately six (6) months after Plaintiff started working for Defendant, around June 2015 Defendant informed Plaintiff that he was charging commissions that exceeded their theretofore undisclosed company policy and placed him on plan of heightened supervision related to those "over-charges". (Lesnik Decl. ¶ 71)

124.    Plaintiff was placed on the plan of heightened supervision because he was charging commission rates similar to the rates he charged while working for his previous employers, which were, unbeknownst to him at the time, at a rate higher than the rates dictated

solely by Defendant's non-negotiable commission schedule. (Lesnik Decl. ¶ 72, Exhibit 3 at P. 17)

125.    As part of the plan for heightened supervision, all aspects of Plaintiff's work were subjected to extremely close monitoring and surveillance and Defendant required that Plaintiff attend mandatory training provided by Defendant. Additionally, the difference in the commission Plaintiff received that was in excess of Defendant's commission schedule was deducted from his subsequent paychecks until it was completely paid back. (Lesnik Decl. ¶ 73)

126.    After (12) months, in around June 2016 Plaintiff successfully and satisfactorily completed the plan of heightened supervision. (Lesnik Decl. ¶ 74)

127.    For the remainder of his employment with Defendant's firm, Plaintiff was never placed on another plan of heightened supervision or disciplined or issued any type of written warning or correction letter by Defendant regarding the types or volume of transactions he conducted or any other reason. (Lesnik Decl. ¶ 75, Exhibit 3 at P. 27)

128.    For the entirety of Plaintiff's employment with Defendant, Plaintiff provided a high standard of investment advice and quality of customer service and the clients whose accounts Plaintiff serviced were very pleased with the quality of the work Plaintiff provided including the higher-than-market-rate returns on many of the accounts Plaintiff managed. Plaintiff had great relationships with his clients, many of whom he considers to be friends. (Lesnik Decl. ¶ 76, Exhibit 7 at P. 80; Exhibit 10 at p. 86).

129.    Within six months of starting at Defendant's firm,  Defendant instructed Plaintiff that he was required to obtain and maintain my license to sell life insurance. (Lesnik Decl. ¶ 77)

130.    It was not until several months after Plaintiff started working for Defendant and all of the clients in his book of business transferred all of their accounts to Defendant's firm that Defendant informed Plaintiff that he was required to adhere to a substantially lower commission schedule than Plaintiff had previously been led to believe (Lesnik Decl. ¶ 67).

131.    This inordinately low commission schedule was non-negotiable and strictly enforced (Lesnik Decl. ¶ 67)

132.    Due to the shortfall in Plaintiff's income attributable to Defendant's non-negotiable and strictly enforced commission schedule, which was unknown to and falsely represented by Defendant to Plaintiff when he accepted employment with Defendant, it became apparent that Plaintiff would not be able to meet his financial obligations required to pay back the Wells Fargo Loan at the rate they demanded .  (Lesnik Decl. ¶ 78).

133.    The only reason Plaintiff brought his book of clients to Defendant and accepted a position working for Defendant was because Defendant indicated during the recruitment process that Plaintiff would be able charge the a commission rate comparable to the industry standard he was allowed to charge while he was employed at his previous employers, Wells Fargo and other major financial brokerages This would have allowed Plaintiff to adhere to the repayment plan for the Wells Fargo Loan (Lesnik Decl. ¶ 79).

134.    Plaintiff attempted to renegotiate the repayment terms of the Wells Fargo Loan, however Wells Fargo was not amenable to a restructuring of the repayment plan that would be feasible for Plaintiff considering his restricted income level under Defendant's non-negotiable commission schedule. (Lesnik Decl. ¶ 80).

135.   With the negotiations at an impasse, Wells Fargo commenced FINRA arbitration against Plaintiff around June 2016. Plaintiff appeared as a respondent in the arbitration *pro se*. (Lesnik Decl. ¶ 81)

136.   Defendant was fully aware of the arbitration commenced against Plaintiff by Wells Fargo in 2016. (Lesnik Decl. ¶ 82)

137.   Around August 2016 in recognition of Plaintiff's successful completion of the 1-year plan of heightened supervision as well as the above-market-rate returns on many of the accounts he served, and as a demonstration of Defendant's confidence in Plaintiff's abilities as a sound and capable financial advisor as reflected in his recent audit, Defendant, via Mr. Scher proposed that Plaintiff open up a satellite office of Defendant's firm out of Plaintiff's home in Brooklyn.  Defendant offered this proposal and Plaintiff opened up the office out of a spare room in his home. (Lesnik Decl. ¶ 83)

138.   Defendant does not allow Financial Advisors who they suspect of unsound or suspicious business practices to open up home satellite branch offices. (See Exhibit 10 at P.116)

139.   Around August 2016 Defendant allowed Plaintiff to open up a home satellite branch office. (Lesnik Decl. ¶ 83)

140.   Defendant required that Plaintiff hang a sign on his new satellite office's door that displayed Defendant's name and logo and continued to exercise a high degree of oversight and control of Plaintiff's day-to-day business operations. (Lesnik Decl. ¶ 84).

141.   After Defendant allowed Plaintiff to begin working from his satellite office, Defendant performed an audit of Plaintiff's work and of the new satellite office. (Lesnik Decl. ¶ 85).

142.    Plaintiff began working from his home satellite office and shortly thereafter Defendant performed a routine initial audit of the new satellite office. (Lesnik Decl. ¶ 85)

143.    Defendant's audit of Plaintiff work and of his satellite office found them to be "satisfactory" and recommended only minor improvements. The auditor expressed to Plaintiff during the closing meeting of the audit and later to Mr. Scher that he was very impressed with Plaintiff's audit results particularly in light of the fact that this was the very first audit of Plaintiff's home satellite branch office. Within time frame  required by Defendant, Plaintiff rectified all of the minor deficiencies Defendant noted in the audit. (Lesnik Decl. ¶ 86; Exhibit 10 at pp. 56-57).

144.    Plaintiff promptly rectified all areas where improvement had been recommended within the 30-day period required by Defendant. (Lesnik Decl. ¶ 86)

145.    Approximately one year after Wells Fargo initiated arbitration against Plaintiff, around June, 2017 Wells Fargo prevailed in the arbitration obtaining an arbitration judgement against Plaintiff in excess of $200,000.00. (Lesnik Decl. ¶ 87)

146.    Plaintiff promptly informed Defendant of the FINRA award that had just been granted against him.  (Lesnik Decl. ¶ 88)

147.    In the same email, Plaintiff informed Defendant that because Plaintiff could not pay the award on the timeframe demanded under the award, and because defaulting on the award payment would result in a suspension of Plaintiff's FINRA license, Plaintiff's only option to protect his FINRA license and thus his livelihood, would be to seek bankruptcy protection (See Exhibit H)

148.    In a later email, Plaintiff informed Defendant that since he was filing for bankruptcy FINRA informed him that his license was no longer under threat of suspension (See Exhibit I).

149.    Upon learning that Plaintiff intended to file for bankruptcy, Defendant began the process reviewing Plaintiff's work history at Defendant's firm in microscopic detail. (Lesnik Decl. ¶¶ 91-95)

150.    Plaintiff filed his petition for Chapter 7 bankruptcy on July 20, 2017. (Exhibit Q)

151.    Defendant admits that Plaintiff's bankruptcy filing was "the catalyst" for the severe measure of bringing Plaintiff before their Business Conduct Committee or "BCC" where upon Defendant began making inquiries about trades that otherwise would have drawn no inquiry. (Bonisteel Decl. ¶ 15; Exhibit K at D001449-D001480)

152.    Shortly after Plaintiff notified Defendant of the bankruptcy, Defendant's compliance personnel began making a series of inquiries about trades Plaintiff conducted earlier in the year. (Lesnik Decl. ¶ 95-96, See Exhibit K at D001449, D001454, D001460, D001466 and D001472)

153.    In August 2017, Defendant's BCC convened to review Plaintiff's circumstances and business conduct.  The reason for this review as reflected in the agenda for that meeting was because Plaintiff "[f]iled for bankruptcy to avoid suspension by FINRA due to [Plaintiff]'s failure to pay an arbitration award granted to his previous firm."  That agenda contains no other basis for the BCC's review. (Exhibit J)

154.    Typically, Defendant, as well as Plaintiff's previous employers would occasionally initiate inquiries regarding account activity, this is commonplace industry-wide.  The inquiries made of my accounts were always satisfactorily resolved after I provided a written explanation and upon examination of the performance of the investments I made on behalf of my clients, which nearly always resulted in above-market and/or satisfactory returns. (Lesnik Decl. ¶ 94)

155.    Defendant made an unprecedented *five* inquiries about Plaintiff's trading activity in the month of September 2017, after he reported his bankruptcy and while it was pending. (Lesnik Decl. ¶¶ 95-97, Exhibit J).

156.    It was obvious to Plaintiff given his nearly 30 years of experience in the industry that the sole reason for these inquiries was Plaintiff's pending bankruptcy (Lesnik Decl. ¶¶ 97-98). In Plaintiff's approximately 29 years as a financial advisor, prior to filing for bankruptcy, he had never received five inquiries from any employer about trading activity in a single month. (Lesnik Decl. ¶ 98).

157.    Plaintiff provided thorough written explanations for all of the inquiries justifying the questioned trading activity. (See Exhibit K at D001450-D001453, D001455-D001459, D001461-D001465, D001467-D001471 and D001473-D001480)

158.    Plaintiff's former colleague, Scott Fox has been recognized by Defendant as having engaged in an "enormous" amount of penny or low-cap stock trades (Lesnik Decl. ¶ 105, Exhibit 4 p. 121). Scott Fox's audits have also been identified has requiring far more drastic remedial action than any audits conducted upon Plaintiff. (Lesnik Decl. ¶ 105)

159.    Scott Fox has not filed for bankruptcy. (Lesnik Decl. ¶ 105)

160.    At least one client has complained about Scott Fox making disparaging comments about Plaintiff to them after Plaintiff was terminated. (See Exhibit 10 at p. 101)

161.    Defendant brought Plaintiff under review of their BCC solely because of his Chapter 7 bankruptcy filing.  Being brought before the BCC is universally understood by Financial Advisors at Defendant's firm to be a very serious measure with potentially harmful and possibly career-ending consequences. (Lesnik Decl. ¶ 106)

162.    Around November 16, 2017, Plaintiff received a letter from Defendant stating that Defendant's Business Conduct Committee ("BCC") recently met to review Plaintiff's recent and still-pending Chapter 7 bankruptcy filing, and as a result of that review, Defendant was terminating Plaintiff's employment based solely on his then still-pending bankruptcy filing a few months earlier. (Exhibit L).

163.    Crestfallen and extremely distraught about the termination, Plaintiff contacted Mr. Scher, who was his supervisor about the reason for the termination. When discussing the termination, Mr. Scher told Plaintiff: "This is because of your bankruptcy." (Lesnik Decl. ¶ 126; Exhibit 10 at p. 78)

164.    Numerous financial advisors for Defendant have engaged in sales practices that have directly resulted in both multiple and serious surveillance inquiries from Defendant as well as FINRA investigations, disclosures or costly arbitration awards against Defendant, yet many of the financial advisors who engaged in those violations were either not terminated by Defendant or allowed to voluntarily separate from the firm, thus avoiding career-ending FINRA form U5 ramifications. This information is publicly available on brokercheck.com. (Lesnik Decl. ¶ 106)

165.    A financial advisor at Defendant's firm, Ivy Menchel, committed a serious FINRA violation resulting in a award against Defendant's firm and that financial advisor was not terminated. (See Exhibit 4 pp. 81-82)

166.    Plaintiff has never been accused of a FINRA violation. (Lesnik Decl. ¶ 64)

167.    The termination letter Defendant sent Plaintiff made no mention of any other reason for Defendant's decision to terminate Plaintiff's other than his Chapter 7 filing. (Exhibit L).

168.    When Defendant has terminated individuals for multiple reasons they indicate those reasons on the termination letter. (See e.g. Exhibit 11)

169.    The phrase "financial fitness" does not appear of Plaintiff's termination letter. (See Exhibit L)

170.    Plaintiff was on sound financial footing after filing for bankruptcy (Lesnik Decl. ¶ 104)

171.    The phrase "sales practices" does not appear on Plaintiff's termination letter. (See Exhibit L)

172.    Plaintiff was emotionally devastated because the action he undertook, seeking bankruptcy protection to prevent the suspension of his FINRA license and the inevitable termination of his employment that would have resulted, was used by Defendant as the basis to terminate Plaintiff's employment—the exact result he was trying to prevent by filing for bankruptcy.  In shock and beside himself with despair Plaintiff promptly discovered that terminating and employee because they filed for bankruptcy was illegal and informed Mr. Scher

that Plaintiff would be taking legal action against Defendant because of the wrongful termination.
(Lesnik Decl. ¶¶ 101-102, 117).

173.    Several weeks later Defendant filed a Form U5 with FINRA stating the reason for Plaintiff's termination was because of his "financial fitness and sales practices." (See Exhibit M)

174.    The word bankruptcy does not appear on the U5 Defendant filed with FINRA approximately 3 weeks after Plaintiff's termination. (See Exhibit M)

175.    This statement on the U5 directly contradicts the reason Defendant gave to Plaintiff for why he was terminated, which was due to his bankruptcy. Absent from this Form U5 under the reason for termination is the word "bankruptcy."  (See Exhibit L; Exhibit N)

176.    Defendant stated on the U5 they filed that the reason for termination purportedly was concerns about "sales practices", however in response to question 7F.1. of the same form, which asks if the discharge was because of alleged violation of any "investment-related statutes, regulations, rules or Industry standards of conduct" Defendant answered "no." (See Exhibit M)

177.    FINRA Rule 1122 provides that: "No member or person associated with a member shall file with FINRA information with respect to membership or registration which is **incomplete** or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof." (emphasis added) FINRA Rule 1122. "Filing Misleading Information As To Membership Or Registration.

178.    FINRA Rule 2010 provides that: A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade. **For**

**filing false, misleading, or inaccurate** U4 or U5 forms or amendments, FINRA's Sanction Guideline recommends consideration of a monetary fine of $5,000 to $146,000 against the responsible principal and/or firm, and suspension of the responsible principal in all supervisory capacities for 10 to 30 business days. See FINRA Sanction Guideline p. 71. In determining the appropriate sanctions, FINRA's Sanction Guideline proposes the following considerations: 1) nature and significance of information at issue, 2) whether failure resulted in statutorily disqualified individual becoming or remaining associated with a firm, and 3) **whether respondent member firm's misconduct resulted in harm to a registered representative**, another member firm, or any other person or entity. *Id.* (emphasis added)

179.    On or about Nov. 16, 2017 furnished a letter to Plaintiff stating: On November 13, 2017 the Business Conduct Committee of Lincoln Financial Advisors (LFA) met to discuss your case involving your recent Chapter 7 bankruptcy filing. As a result of the review, the Business Conduct Committee decided to terminate your registration with [Defendant]. (See Exhibit L)

180.    Defendant's false, incomplete and misleading statements on the U5 form they filed with FINRA effectively eliminated all prospects for future employment in the industry with any other financial advisor firms by falsely stating that Plaintiff was terminated for 'concerns about "financial fitness and sales practices" (Lesnik Decl. ¶ 109) and by stealing Plaintiff's book of clients, that he cultivated over a nearly 3 decade long career of dedication and hard work. (Lesnik Decl. ¶ 119)

181.    As a recovering alcoholic, sobriety remains a day-to-day struggle in Plaintiff's daily life and at the time of his termination he had been sober for nearly a year.  The devastating emotional impact of Defendant's actions including terminating my employment,

stealing his book of clients and having my nearly 3-decade long career destroyed in one fell swoop drove him to a severe relapse.  Plaintiff was admitted to an in-patient alcohol treatment facility for two-weeks to attempt to prevent Plaintiff's life from further spiraling downward and out of control. (Lesnik Decl. ¶ 118)

182.    Based upon Defendant's incomplete and misleading statement in the U5 form, around December 26, 2017, FINRA initiated an investigation to uncover whether Plaintiff engaged in any activity while working for Defendant that violated any securities laws or FINRA, NYSE, NASD or MSRB rules or regulations. (See Exhibit N)

183.    Around February 14, 2018 after finding no evidence that Plaintiff violated any securities laws or FINRA, NYSE, NASD or MSRB rules or regulations, FINRA closed the investigation and took no further action. (Lesnik Decl. ¶ 111)

184.    After I was terminated, nearly all of Plaintiff's stolen book of business was assigned to another financial advisor in Defendant's New York City office, Scott Fox.  See (Lesnik Decl. ¶ 112)

185.    In communicating with at least one of Plaintiff's former clients, who Plaintiff has known and provided services for many years, Mr. Fox slandered Plaintiff to that former client, making disparaging and provably false comments about Plaintiff such as: "JEFF [PLAINTIFF] DIDN'T CARE ABOUT YOUR ACCOUNT." (Lesnik Decl. ¶ 112) Additionally, Mr. Fox's disparaging comments about Plaintiff to clients were so offensive that one client saw fit to reach out to Mr. Fox's supervisor, Mr. Scher to complain about the disparaging comments Mr. Fox was making about Plaintiff. (See Exhibit 10 at p. 101)

186.     While Plaintiff's bankruptcy was pending and after Defendant terminated his employment, Plaintiff was desperate to attempt to salvage what he could of his career as a financial advisor, however due to the false statement on the FINRA U5 regarding the reason for his termination and because he no longer had a book of business, such an endeavor proved impossible. (Lesnik Decl. ¶¶ 117, 119).

187.     Around January 22, 2018, while Plaintiff's bankruptcy was pending, he sent a letter to the bankruptcy trustee assigned to his case informing her, *inter alia*, that Plaintiff's employer terminated my employment as a result of the bankruptcy (see Lesnik Decl. ¶ 116, Exhibit 1), and thus that Plaintiff was discriminated against in violation of the bankruptcy code.  The trustee took no action to include that claim as an asset of the bankruptcy estate because it accrued after the bankruptcy was filed in July of 2017. *Id*.

188.     While Plaintiff's bankruptcy was pending, on around January 24, 2018 the Schedule A/B of his bankruptcy petition was amended to correct the stated valuation of a vintage Ford Mustang automobile as an asset. (See Exhibit P at #3.1; and Exhibit 6 at #3.1).

189.     Plaintiff's bankruptcy case was discharged on around March 18, 2018 (See Exhibit Q at Dkt. #42).

190.     Plaintiff has attempted to obtain employment with numerous other financial brokerages in an attempt to begin to rebuild his career in the aftermath of devastation wrought by Defendant's actions to no avail. The primary basis for these firms declining to hire Plaintiff has been the statement Defendant made on the U5 and that Plaintiff no longer has a book of business. (Lesnik Decl. ¶ 119)

191.    Plaintiff now works as a retail clerk at Home Depot in Brooklyn. (Lesnik Decl. ¶ 120)

192.    The symptoms Plaintiff has suffered due to the devastating impact of Defendant's actions include, sleep disturbance, helplessness, isolation, functional decline, nervousness, decreased energy, poor motivation, hopelessness, worthlessness, high blood pressure alcoholism relapse and hypertension.  (Lesnik Decl. ¶ 123).

193.    Since Plaintiff's inpatient rehab/hospitalization due to his alcoholism relapse in the wake of his termination, Plaintiff has been and continues to be prescribed mood-stabilizing and anti-depression medication. (Lesnik Decl. ¶ 121)

194.    As a result of the acts and conduct taken by Defendant, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, commissions, bonuses, benefits and other compensation which such employment entails. Plaintiff has also suffered massive future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. (Lesnik Decl. ¶ 125)

*       *       *       *       *       *       *       *       *

Based upon these undisputed facts, for the reasons set forth in Plaintiff's memorandum of law in opposition to Defendant's motion for summary judgment and in support of Plaintiff's partial cross motion for summary judgment, Defendant's motion should be denied in it entirety and Plaintiff's partial motion for summary judgment should granted as a matter of law.

DATED:      New York, New York
            April 7, 2020

                                DEREK SMITH LAW GROUP, PLLC

*Attorneys for Plaintiff*
 By: _/s/ Seamus Barrett_____
Seamus P. Barrett, Esq.
1 Penn Plaza, Suite 4905
New York, NY 10119
(212) 587-0760